## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## NEW ALBANY DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. David Abrams,<br>STATE OF INDIANA ex rel. David Abrams,<br><br>Plaintiffs,<br><br>v.<br><br>PROCARENT, INC.,<br>YELLOW ENTERPRISE SYSTEMS, LLC<br>   a/k/a YELLOW ENTERPRISE SYSTEMS<br>   a/k/a YELLOW AMBULANCE OF<br>      SOUTHERN INDIANA<br>   a/k/a YELLOW AMBULANCE SERVICE,<br>CARE AMBULANCE SERVICE, LLC<br>   a/k/a CARE AMBULANCE,<br>GATEWAY AMBULANCE SERVICE, LLC<br>   a/k/a GATEWAY AMBULANCE,<br>MICHAEL J. MACKIN,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)   Case No. 4:15-cv-00104-TWP-DML<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## ENTRY ON DEFENDANTS' MOTIONS TO DISMISS

This matter is before the Court on two Motions to Dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6). Defendants Procarent, Inc. ("Procarent"), Yellow Enterprise Systems, LLC ("Yellow Enterprise"), Care Ambulance Service, LLC ("CARE"), Gateway Ambulance Service, LLC ("Gateway"), and Michael J. Mackin ("Michael Mackin") (collectively, "Defendants") filed a Motion to Dismiss (Filing No. 122).[1] Defendant Charles Coffelt ("Coffelt") also filed a Motion to Dismiss, (Filing No. 124); however, Coffelt was terminated as a defendant on December 20, 2019, so his Motion is **denied** as moot. Relator David Abrams ("Abrams")

---

[1] This Motion to Dismiss was also filed on behalf of Defendants Craig L. Mackin ("Craig Mackin"); Jay L. Mackin ("Jay Mackin"); Jeffrey L. Mackin ("Jeffrey Mackin"); Dru Milby ("Milby"); Shanna Sweeney ("Sweeney"); and Debbie Thompson ("Thompson"). These parties were later dismissed without prejudice (*see* Filing No. 143).

initiated this action under the False Claims Act ("FCA") against his former employer, a number of related corporate entities, former employees, and board members.   The Amended Complaint pertinent to this Entry, (Filing No. 105),[2] alleges that the Defendants, as operators of ambulance services in Southern Indiana, gave unlawful kickbacks to hospitals and skilled nursing facilities ("SNFs") to induce those facilities to steer Medicare patients to the Defendants' companies anytime ambulance transport was needed. Based on these allegations, Abrams' Amended Complaint brings five claims under the FCA, which, generally speaking, prohibits presenting the government false or fraudulent claims for payment.  For the following reasons, the Motion to Dismiss related to the remaining Defendants, (Filing No. 122), is **granted in part and denied in part**.

## I.      BACKGROUND

The following facts are not necessarily objectively true, but as required when reviewing a motion to dismiss, the Court accepts as true all factual allegations in the complaint and draws all inferences in favor of Abrams as the non-movant.  *See Bielanski v. County of Kane*, 550 F.3d 632, 633 (7th Cir. 2008).  The 81-page Amended Complaint is very detailed and is supported by 18 attached exhibits. (Filing No. 105.) The Court will summarize the allegations, and to the extent necessary to resolve the motions at issue, add other necessary facts in the Discussion section of this Entry as needed.

## A.      The Parties

Abrams is a United States citizen who lives in South Carolina.  (Filing No. 105 at 5.)  He has received certifications for emergency medical technician ("EMT") Basic Training and EMT Paramedic Training.  *Id.*  He was employed by Gateway, a division or affiliate of Procarent, as

---

[2] Abrams also alleges that the Defendants fraudulently upcoded ambulance transports to the highest Medicare reimbursement levels in violation of Medicare laws (Filing No. 105). But because the Defendants do not challenge that claim at this stage in the litigation, the Court need not discuss it.

Emergency Medical Services ("EMS") director, from March 2012 to April 2013. *Id.* After that, Abrams was employed by Yellow Ambulance of Kentucky and Indiana, a division or affiliate of Procarent, as the director of ambulance services until April 2015. *Id.* at 5–6. He is currently employed as the EMS director for Charleston County, South Carolina. *Id.* at 6.

During his employment with Yellow Ambulance of Kentucky and Indiana, Abrams discovered numerous written agreements and arrangements between Procarent and its affiliates in which unlawful kickbacks were provided by Procarent and its affiliates and accepted by hospitals and SNFs.[3] *Id.* Because of his employment with Yellow Ambulance of Kentucky and Indiana, Abrams has direct knowledge of these misdeeds. *Id.*

While employed with Yellow Ambulance of Kentucky and Indiana, Abrams repeatedly warned and complained to the Defendants about the fraudulent and abusive nature of their conduct, advising that their conduct violated Medicare laws and regulations as well as the FCA and could expose them to liability. *Id.* The Defendants ignored these warnings and harassed and discriminated against Abrams because he continued to warn them. *Id.* Abrams was constructively discharged from his employment because he refused to accede to the Defendants' course of action. *Id.* He was also harassed and discriminated against by the Defendants because he refused to consent to or participate in Defendants' unlawful acts. *Id.*

Procarent, a for-profit corporation was incorporated in Kentucky in approximately 1978, is based in Louisville, Kentucky. *Id.* at 7. It conducts business in Kentucky, Indiana, and Missouri. Procarent is owned entirely by Interlock Industries, Inc., a company owned and controlled by the Mackin family, some of whom are named as Defendants in this suit. *Id.* One part of Procarent's business is providing emergency and non-emergency transportation services, as well as wheelchair

---

[3] Abrams also became aware of numerous so-called upcoding frauds that were committed by the Defendants with respect to ambulance transports. *Id.*

transportation services.  *Id.*  Procarent formerly conducted and operated its ambulance and wheelchair transport business through four separate, wholly owned affiliates: Yellow Ambulance of Kentucky and Indiana, Yellow Ambulance of Owensboro Daviess County Kentucky, Care Ambulance Service, LLC, and Gateway Ambulance Services, LLC.  *Id.*

Yellow Enterprise is a Kentucky manager-managed limited liability company owned or controlled by Procarent or the Mackin family. *Id.* at 7. Yellow Enterprise owns and operates Yellow Ambulance of Kentucky and Indiana and Yellow Ambulance of Owensboro Daviess County Kentucky. *Id.* at 8. Yellow Enterprise is headquartered in Louisville, Kentucky, at the same location as Procarent, and the managers of Yellow Enterprise are Craig Mackin and Jeffrey Mackin.  *Id.* at 7-8.

CARE was an Indiana limited liability company owned, affiliated with, and controlled by Procarent or the Mackin family.  *Id.*  CARE was dissolved on May 13, 2019.  CARE was used by Procarent and the Mackin family to operate ambulance and wheelchair services.  Defendants' wheelchair services were offered solely under the CARE moniker.  *Id.*  CARE was headquartered in Louisville at the same location as Procarent and Yellow Enterprise.  *Id.* at 8.

Gateway was a Kentucky limited liability company owned, affiliated with, or controlled by Procarent or the Mackin family.  *Id.*  Gateway was also dissolved on May 13, 2019.  *Id.* Gateway was used by Defendants to offer ambulance services and was headquartered at the same location in Louisville as Procarent, Yellow Enterprise, and CARE.  *Id.*

Michael Mackin is a citizen of Kentucky who is one owner and operator of Procarent.  *Id.* at 11.  He has been an officer or board member of Procarent.  He has direct ownership of and substantial operational control over Procarent and its subsidiaries.  *Id.*

**B.**   **Medicare Background[4]**

The United States, through the Department of Health and Human Services ("HHS"), administers the Supplementary Medical Insurance Program for the Aged and Disabled established by Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.* ("Medicare"). Medicare Part A generally authorizes payment for institutional care, including hospital, SNF, and home health care for eligible individuals. *See* 42 U.S.C. §§ 1395c-1395i. Medicare Part B is a voluntary subscription program of supplementary medical insurance covering items and services other than hospitalization expenses, such as charges for ambulance transport services. 42 U.S.C. § 1395k(a)(2)(B). An enrolled individual who receives a covered ambulance transport service assigns the right to reimbursement of 80% of the reasonable charge to the provider rendering the service, who collects as an assignee of the beneficiary under 42 U.S.C. § 1395(b)(3)(B)(ii). *See also* 42 C.F.R. §§ 414.610(b) and 414.615. The Medicare payment for ambulance services is based upon the lesser of the actual charge or the applicable fee schedule amount. 42 U.S.C. §§ 1395l and 1395m; 42 C.F.R. § 414.610(a).

Federal statutes and regulations proscribe billing any federal health care program for excessive charges or for medically unnecessary services. 42 U.S.C. § 1320a-7(b)(6)(A). In 1982, Congress created a prospective payment system for Medicare payments to hospitals. This system is a per-case reimbursement mechanism under which hospital inpatient admission cases are divided into categories called diagnosis-related groups ("DRGs"). In this DRG prospective payment system, Medicare pays hospitals a flat rate per case for inpatient hospital care. *Medicare Claims Processing Manual*, ch. 3, §.

---

[4] The Court gives this summary of Medicare to provide context for the allegations Abrams levels against Defendants that he purports violate Medicare and False Claims Act statutes. These summaries of areas of law are not facts and Abrams is entitled to no presumption that the summaries contained in his Amended Complaint are accurate, nor is he entitled to have any inferences drawn in his favor when it comes to legal issues.

Generally, Medicare Part A pays the hospital a pre-set amount for all services provided to a Medicare beneficiary who is a hospital inpatient.  Even when the hospital inpatient must be transported by ambulance to another hospital or other facility, such ambulance transport is absorbed by the Part A Provider and the hospital cannot bill Medicare separately for the service. The hospital is already being paid under the DRG, which represents payment for all expenses including ambulance transportation.  *Medicare Claims Processing Manual*, ch. 15, § 30.1.4.  Thus, when an ambulance transport occurs during a Part-A-covered inpatient stay, the hospital must pay the ambulance provider out of its own pocket (including the Medicare Part A reimbursement it receives) and cannot bill Medicare separately for the ambulance transport.  Under that scheme, the more services covered by Part A that the hospital provides to the patient, the less profit the hospital makes on that patient because it receives a flat fee reimbursement from Medicare regardless of the volume of services provided.

Under Medicare, some ambulance transports are covered under Part A and others are covered under Part B.  Ambulance transports within a hospital campus or to other hospitals for testing are considered Part A services, and thus not separately billable.  *See Medicare Claims Processing Manual*, ch. 3, § 10.4.  But other ambulance transports are specifically excluded from Part A and may be separately billed under Part B.  *See id.*, ch. 3, § 10.5.  Ambulance transports covered under Part B include transportation of a beneficiary from his home or the scene of an accident to a hospital and transportation of a beneficiary from one hospital to another hospital when he is admitted as an inpatient to that second hospital.  *See id.*, ch. 3, § 10.4.  This same general framework exists for SNFs as well—some ambulance transport is covered by the flat fee Medicare Part A, but other ambulance transport can be billed separately under Part B.  Hospitals

and SNFs can refer ambulance transport under both Part A and Part B to the ambulance provider of their choice.

### 1.     Defendants' Agreements with Federal Health Care Programs

One or more of the Defendants entered into Participating Provider Agreements with Medicare and thereby became "Participating Providers" as defined in Title 42 of the Code of Federal Regulations. Pursuant to the Provider Agreements, these Defendants agreed to accept assignments of monies paid for Medicare beneficiaries, and those payments were made directly to Defendants.  42 U.S. § 1395cc; 42 C.F.R. § 489.3.  Generally, an assignment is an agreement by the health care provider to be paid directly by Medicare, to accept the amount Medicare approves for the service, and not to bill the patient for any more than the Medicare deductible and co-insurance.

The Medicare participation agreement these Defendants signed informed them that claims for health care services provided in violation of the Anti-Kickback Statute would not qualify for payment or assignment under Medicare laws and regulations.  Defendants certified that they would comply with Medicare laws and regulations and that the fulfillment of Medicare claims was predicated upon their compliance with those laws and regulations, including the Anti-Kickback Statute.

### 2.     Medicare Claims

Ambulance transport providers make claims for payment to the federal government on Form CMS-1500.  *See Medicare Claims Processing Manual*, ch. 3, § 10.1.B.  Form CMS-1500 contains the following certification which must be signed by the provider: "I certify that the statements on the reverse apply to this bill and are made a part hereof."  The reverse side of the form contains the following:

BECAUSE THIS FORM IS USED BY VARIOUS GOVERNMENT AND PRIVATE HEALTH PROGRAMS, SEE SEPARATE INSTRUCTION ISSUED BY APPLICABLE PROGRAMS…

NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties. ***

SIGNATURE OF PHYSICIAN OR SUPPLIER…
I certify that … the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as individual rendering each service is reported in the designated section . . .

NOTICE: Anyone who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable federal laws. ***

SIGNATURE OF PHYSICIAN (OR SUPPLIER): I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction.

NOTICE: This is to certify that the foregoing information is true, accurate, and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

The Defendant businesses and their agents submitted a CMS-1500 or similar claim form for reimbursements from Medicare since at least 2005.

C.   **Defendants' Business Practices**

Abrams' Amended Complaint details an alleged scheme whereby the Defendant companies provided kickbacks to a number of hospitals and SNFs in exchange for referrals of wheelchair and ambulance transports. (Filing No. 105 at 27–28.) Since approximately 2005, the Defendants have submitted, and continue to submit, materially false claims to the federal government as a result of past and current kickback arrangements and schemes with hospitals and SNFs. *Id.* at 27. These

kickbacks took the form of in-kind remuneration paid and provided to the hospitals and SNFs as follows: (a) steep, below-cost money discounts for wheelchair van transports; (b) free mileage for wheelchair transports; (c) steep, below-cost money discounts for Part A ambulance transports; and (d) free mileage for Medicare Part A ambulance transports. *Id.* at 28.  These kickbacks allowed hospitals and SNFs to pay for wheelchair and ambulance transport services at prices that were substantially below market value.  *Id.*  In exchange, the hospitals and SNFs referred their Medicare Part A and Part B ambulance transports to Procarent and the other Defendant companies.  *Id.*

To implement this scheme, CARE offered to provide wheelchair transport services—which are not covered by Medicare—for a low flat fee price between $23.00 to $42.00 per one-way transport and as much as five to ten free miles.  *Id.*  These prices were unreasonable relative to the market. *Id.* Although CARE typically does not offer these services to clients unless they are able to refer Part A or Part B ambulance transport business, *id.* at 28–29, its cost for wheelchair transport for non-referrers is $61.00 plus mileage per one-way transport.  *Id.* at 29.  Because $49.00 was barely a break-even point for wheelchair runs, the $23.00 to $42.00 rate offered to induce referrals was well below the cost of providing the service. *Id.* And in addition to discounting wheelchair transports, CARE discounted Part A ambulance runs to induce hospitals and SNFs to refer Part A and Part B ambulance stretcher runs.  *Id.* at 51–56.  For its part, Yellow Enterprise also discounted Medicare Part A ambulance runs to induce hospitals and SNFs to refer Part B ambulance stretcher transports.  *Id.* at 41–51. These schemes would be discussed at meetings where the business operations of all the companies was planned.  *Id.* at 30–41.

## II.     LEGAL STANDARD

### A.     Dismissal Under Fed. R. Civ. P. 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) allows a defendant to move to dismiss a complaint that has failed to "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  When

deciding a motion to dismiss under Rule 12(b)(6), the court accepts as true all factual allegations in the complaint and draws all inferences in favor of the plaintiff. *Bielanski*, 550 F.3d at 633. However, courts "are not obliged to accept as true legal conclusions or unsupported conclusions of fact." *Hickey v. O'Bannon*, 287 F.3d 656, 658 (7th Cir. 2002).

The complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. Civ. P. 8(a)(2). In *Bell Atlantic Corp. v. Twombly*, the United States Supreme Court explained that the complaint must allege facts that are "enough to raise a right to relief above the speculative level." 550 U.S. 544, 555 (2007). Although "detailed factual allegations" are not required, mere "labels," "conclusions," or "formulaic recitation[s] of the elements of a cause of action" are insufficient. *Id.*; *see also Bissessur v. Ind. Univ. Bd. or Trs.*, 581 F.3d 599, 603 (7th Cir. 2009) ("it is not enough to give a threadbare recitation of the elements of a claim without factual support"). The allegations must "give the defendant fair notice of what the … claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. Stated differently, the complaint must include "enough facts to state a claim to relief that is plausible on its face." *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009) (citations and quotation marks omitted). To be facially plausible, the complaint must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

**B.     Dismissal Under Fed. R. Civ. P. 9(b)**

What's more, because Abrams' "claims arise under the FCA, an anti-fraud statute, they are subject to the heightened pleading requirements of Rule 9(b)." *United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 839 (7th Cir. 2018). Federal Rule of Civil Procedure 9(b) states, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind

may be alleged generally."  The Seventh Circuit has interpreted this particularity requirement to mean that the complaint must identify the "who, what, when, where, and how" of the alleged fraud. *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 646 (7th Cir. 2019) (citing *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 736 (7th Cir. 2019)).  "What constitutes 'particularity,' however, may depend on the facts of a given case."  *Berkowitz*, 896 F.3d at 839–40 (citing *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreens Co.*, 631 F.3d 436, 442 (7th Cir. 2011) (citations omitted)). This "heightened pleading requirement in fraud cases 'forces the plaintiff to conduct a careful pretrial investigation' to minimize the risk of damage associated with a baseless claim."  *Id.* at 840 (quoting *Fidelity Nat'l Title Ins. Co. of N.Y. v. Intercounty Nat'l Title Ins. Co.*, 412 F.3d 745, 748–49 (7th Cir. 2005)).  That said, all "[p]leadings must be construed so as to do justice."  Fed. R. Civ. P. 8(e).

## III.   DISCUSSION

The FCA, codified at 31 U.S.C. §§ 3729–3733, authorizes a private person, called a relator, to enforce its terms by filing suit "for the person and for the United States Government." § 3730(b)(1). Abrams, as relator, has alleged that the Defendants violated the FCA by inducing referrals to other Medicare-paid services by providing deeply discounted wheelchair transports to hospitals and SNFs.[5]  This scheme, argues Abrams, implicates five separate violations of the FCA: (1) presenting false and fraudulent claims for payment to the government; (2) knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim to the government; (3) avoiding paying the government and from improperly retaining an overpayment by the government; (4) conspiring to violate the FCA; and (5) retaliating against an

---

[5] As previously noted, Abrams also claims that Defendants fraudulently "upcoded" ambulance runs.

employee for reporting or acting to stop FCA violation.[6] The Defendants argue the Court should dismiss (1) "the entire complaint as to Procarent[ ] because it is nothing more than the parent company for the named affiliates and not independently liable," (2) "all of [Abrams]'s anti-kickback allegations," and (3) the "conspiracy count because it violates the intracorporate conspiracy doctrine." (Filing No. 123 at 7.) The Court will address these three contentions in turn.

## A.   <u>Procarent as a defendant</u>

The Defendants argue that all allegations against Procarent should be dismissed because it "is nothing more than the parent company of the ambulance services that filed the claims at issue in this case".  (*Id.* at 24.)  Since parent and subsidiary corporations "'are presumed separate,'" the Defendants argue Abrams cannot pierce the corporate veil because he cannot show

> (1) "that one corporation dominated another to the extent that the subordinate was the mere instrumentality of the dominant corporation," (2) "that the dominant corporation employed the subordinate to perpetrate a fraud," or (3) "that the capital placed in the subordinate was illusory or trifling compared to the business to be done and the risks of loss . . . ."

*Id.* (quoting *Esmark Inc. v. N.L.R.B.*, 887 F.2d 739, 753 (7th Cir. 1989) (quotations omitted)). Because "there are not any claims against Procarent, in and of itself," and "[t]here are no allegations that the subsidiary ambulance service providers and Procarent[ ] are not legally distinct and separate entities," it should be dismissed from the case with prejudice.  *Id.* at 24-25.

In response, Abrams argues that he need not, at this early stage of the litigation, "prove a corporate veil piercing theory."  (Filing No. 126 at 28.)  Instead, he needed only to put the Defendants on notice of this theory in his Amended Complaint.  *Id.* (citing *United States v. All Meat & Poultry Products Stored at Lagrou Cold Storage*, 470 F. Supp. 2d 823, 828 (N.D. Ill. 2007)).  Abrams accomplished this task, he argues, by alleging in his Amended Complaint that (1)

---

[6] Defendants do not challenge Abrams' Count 5, namely that they retaliated against him for reporting or acting to stop FCA violation under 31 U.S.C. § 3730(h)(1).

Procarent is an ambulance and wheelchair transportation company that previously provided its services through wholly owned affiliates, (2) Procarent is wholly owned and directed by the Mackin family, (3) the affiliate companies are owned and controlled by Procarent and the Mackin family, (4) Procarent and all its affiliates share an address, and (5) meetings discussing the fraudulent schemes were conducted for all Procarent businesses, not any specific affiliates. *Id.* at 22–23 (citing Filing No. 105). "These allegations," purport Abrams, "meet the minimal requirements of notice pleading for corporate veil piercing." *Id.* at 29 (quotation marks omitted).

Not so, argue the Defendants in reply: Abrams' response represents the first time that he has contended "that Procarent and its affiliates really had no separate existence apart from its affiliates". (Filing No. 129 at 8.) Because Abrams "conceded" in his Amended Complaint "that Procarent and its affiliates are separate entities[,] he gave no indication at all that he believed them to be operating as one." *Id.* Moreover, argue the Defendants, Abrams for the first time has suggested "Procarent and its affiliates 'failed to observe corporate formalities.'" *Id.* (quoting Filing No. 126 at 23). Because he "always refers to 'Procarent, Inc. and its affiliates' in his Amended Complaint," contend the Defendants, Abrams tacitly acknowledges that they are separate and distinct corporate entities. *Id.* (Emphasis in original.)

Generally speaking, "the doctrine of piercing the corporate veil . . . involves important findings of fact." *Int'l Fin. Servs. Corp. v. Chromas Techs. Canada, Inc.*, 356 F.3d 731, 738 (7th Cir. 2004) (applying Illinois law). At this early stage in the proceedings, the Court is ill-prepared to attempt to substantively apply this equitable doctrine. Despite the Defendants' contentions, Abrams sufficiently placed them on notice in his Amended Complaint that he believed all the entities operated as confederates for Procarent: he alleged that "Procarent formerly conducted and operated its ambulance and wheelchair transport business through four separate, wholly owned

divisions, businesses, or affiliates".   (Filing No. 105 at 7.)   He alleged that the Mackin family

owned and controlled both "Procarent and its affiliates." *Id.* at 7–11.  He alleged that the principal

office of Procarent and each affiliate was "located at 1601 South Preston Avenue, Louisville,

Kentucky." *Id.* at 7–8.  And he alleged that Defendants planned the fraudulent activity at standing

meetings set to collectively strategize the operations for all the entities. *Id.* at 30–31. These

allegations amply apprised the Defendants that Abrams would attempt to pierce the corporate veil.

Because Abrams sufficiently notified Defendants that he believed they were flouting the

corporate forms of the entities by pointing to the redundancies under which they operated through

his Amended Complaint, the Court **denies** the portion of the Defendants' Motion seeking to dismiss

Procarent from the case.

**B.**      **Abrams' kickback allegations as FCA violations**

The FCA bars any person or entity from knowingly presenting, or causing to be presented,

a false or fraudulent claim for payment or approval to the government.  31 U.S.C. § 3729(a)(1)(A).

A false or fraudulent claim arises, under 42 U.S.C. § 1320a-7b(g), when a person or entity presents

to a federal healthcare program, like Medicare, a claim for payment that violates the Anti-Kickback

Statute, which prohibits giving or receiving "remuneration" in return for those programs' business.

42 U.S.C. § 1320a-7b(b).  This tracks the theory Abrams forwards in Count 1; that is, that the

Defendants knowingly presented "false and fraudulent claims for payments from Medicare" for

ambulance services ordered by hospitals and SNFs only after the Defendants first offered steep

discounts on wheelchair transport services as remuneration to those facilities (Filing No. 105 at

73–74).  The FCA also prohibits any person or entity from knowingly making, using, or causing

to be made or used, a false record or statement material to a false or fraudulent claim to the

government. 31 U.S.C. § 3729(a)(1)(B). Here, Abrams argues in Count 2 that Defendants

knowingly made false records or statements (including "ambulance service contracts with their illegal kickback provisions" and completed fraudulent copies of Form CMS-1500) that were material "to the false and fraudulent claims for payments they made and continue to make to the United States for Medicare reimbursements and benefits." (Filing No. 105 at 74.) Finally, the FCA proscribes any person or entity, in what is known as a "reverse false claim," from avoiding paying the government and from improperly retaining an overpayment by the government. 31 U.S.C. § 3729(a)(1)(G). Abrams argues in Count 3 that the Defendants "concealed," "avoided," and "decreased" their obligations to pay the government (Filing No. 105 at 75-76).

To survive a motion to dismiss the Anti-Kickback Statute-based FCA claims, Abrams must plead facts that, if proven, show the Defendants (1) knowingly and willfully (2) offered or paid (3) remuneration (4) in return for purchasing or ordering any item or service for which payment may be made under a federal health care program.  42 U.S.C. § 1320a–7b(b).  The Defendants argue that Abrams has failed the first and third of these prongs.  First, Defendants respond that none of these Anti-Kickback Statute-rooted FCA claims can survive because there was no underlying kickback scheme, defeating the third prong.  There could be no illegal inducement, Defendants argue, when they "knew that the rates they were charging for wheelchair transports were on par, and sometimes significantly more expensive, than the rates of their competitors." (Filing No. 123 at 13.)  In other words, how could a kickback scheme operate when the services operating as "remuneration" were offered at—and sometimes above—the market rate?  *See* 42 U.S.C. § 1320a-7a(6) (providing that "[t]he term 'remuneration' includes . . . transfers of items or services for free or for other than fair market value").

To support the contention that the wheelchair transport services were provided at competitive prices, the Defendants point to the transcripts of some company meetings that Abrams

secretly recorded.  At these meetings, discussion points included signing an SNF to a higher-than-average rate for wheelchair transports because of the high quality of their service, that two competitors offered lower rates, that it could perhaps make financial sense to decrease wheelchair services, and that the profitability of wheelchair transports was neither "great" nor "wonderful". (Filing No. 123 at 13–15). And on top of failing to prove the existence of any remuneration, the Defendants also urge that Abrams has not adequately demonstrated that the Defendants acted knowingly or willfully in violating the Anti-Kickback Statute.  *Id.* at 16–17.  Because they "believed they were offering services at rates comparable to those of their competitors in the market," the Defendants urge, they could not have willfully violated the law.  *Id.* at 17.

In response, Abrams points out that the meeting discussions are up for more than one interpretation. For example, maybe the "discussion of the need to raise prices for wheelchair transports to cover costs is an admission that the pricing was below cost." (Filing No. 126 at 20.) Or perhaps "the referrals induced by pricing wheelchair transports at $35 did not cover the losses incurred in performing wheelchair transports at that price." *Id.* And arguing that some competitors offered the services at a lower rate is non-dispositive because they too may have been operating a kickback scheme: that some "competitors may have also offered kickbacks does not in any way suggest that the fair market value of wheelchair transports was less than the actual cost of providing the service." *Id.* at 21.  On top of all this, wanting to get out of the wheelchair transport business is not inconsistent with a kickback scheme, instead it could show that "the wheelchair business was not inducing enough referrals of other business to cover the losses realized in the wheelchair business." *Id.* at 22.  Moreover, points out Abrams, the Defendants, when pointing to these discussions, never referred to the Medicare Part A discount pricing at all in their arguments, effectively conceding that allegations under that scheme should move forward. *Id.* at 19–20.

Regarding scienter, Abrams again notes that Defendants are silent to the Medicare Part A scheme. *Id.* at 18. As for the wheelchair transports, in addition to the "Defendants explicitly stat[ing] their knowledge that their pricing practices were an unlawful kickback scheme," *id.* at 24, Abrams' repeated general allegations as to their knowing and willful states of mind in his Amended Complaint suffice under Rule 9(b). *Id.* at 25 (citing *United States ex rel. Kennedy v. Aventis Pharm., Inc.*, 610 F. Supp. 2d 938, 943 (N.D. Ill. 2009)).

Defendants reply that Abrams "has failed to explain how the Defendants could be charging less than Fair Market Value, while at the same time charging more than their competitors in the same market." (Filing No. 129 at 5.)  The discussions at the meetings foreclose that Defendants acted knowingly and willfully to violate the Anti-Kickback Statute: instead, they "were concerned that the rates for wheelchair runs needed to be raised to keep up with rising costs."  *Id.* at 6.

Defendants forward sensible theories as to how to view the discussions at the company meetings, and evidence may yet prove this explanation true. *See, e.g.*, *Klaczak v. Consolidated Medical Transport*, 458 F. Supp. 2d 622, 679 (N.D. Ill. 2006) ("Relators cannot prove that the Hospital Defendants received remuneration—something of value—without comparing the contracted rates with fair market value.  However, Relators have failed in this regard. Without the testimony of their putative expert, Relators have no admissible evidence to offer at trial with respect to fair market value.").  But theirs is not the only rational understanding right now. When considering a motion to dismiss, all reasonable inferences must be drawn in favor of the non-moving party, *Bielanski*, 550 F.3d at 633, in this case, Abrams, who has forwarded his own reasonable accounts of the meetings.

Because Abrams offers plausible alternative explanations for the meeting discussions that could support his claims, because the Defendants never address the Medicare Part A referral

scheme, and because Rule 9(b) permits a party to allege "conditions of a person's mind" generally, the Court cannot conclude that his FCA claims stemming from the Anti-Kickback Statute cannot proceed and **denies** this portion of Defendants' Motion (Filing No. 122).

**C.     The FCA conspiracy count**

The FCA further forbids a person or entity from conspiring to commit a violation of any of its other liability provisions. 31 U.S.C. § 3729(a)(1)(C). Abrams, in his Amended Complaint, argued in Count 4 that "Defendants knowingly combined and conspired to violate" the FCA in the ways discussed above. (Filing No. 105 at 76.) The government, Abrams argues, suffered damages following the "combination and conspiracy by, between and among all of Defendants, who each aided and abetted the other defendants in furtherance of the conspiracy". *Id.* at 77. In their brief supporting their Motion to dismiss, Defendants argue that this claim must be dismissed because the "intracorporate conspiracy doctrine" prevents conspiracy charges when all the alleged conspirators are employees of the same corporate entity. (Filing No. 123 at 25-26.)

"[G]eneral civil conspiracy principles apply" to FCA conspiracy claims. *United States ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 545 n. 3 (7th Cir.1999) (citing *United States v. Murphy*, 937 F.2d 1032, 1039 (6th Cir.1991)). One of these principles, as noted by the Seventh Circuit, is "that the corporation and its managers are 'considered as one person in law.'" *Travis v. Gary Cmty. Mental Health Ctr., Inc.*, 921 F.2d 108, 110 (7th Cir. 1990) (quoting William Blackstone, 1 Commentaries on the Laws of England *456 (1st ed. 1765)). This so-called intracorporate conspiracy doctrine has barred conspiracy charges under 42 U.S.C. 1985 when the conspirators were employees of the same corporate entity, *see id.*, and charges under the Sherman Act when the conspirators were wholly owned subsidiaries of a parent corporation, *see Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984). Though the Seventh Circuit has never directly

18

applied this principle to FCA conspiracy claims, the Court sees no reason to discard this time-honored civil conspiracy principle within this context: the intracorporate conspiracy doctrine bars the charge of FCA conspiracy when the alleged conspirators were employees of the same corporate entity or were wholly-owned subsidiaries of a parent corporation.

But Abrams argues in his response brief that this doctrine does not apply because he "has alleged that the Defendants conspired with third parties" to violate the FCA. (Filing No. 126 at 29.) The conspiracy charge should survive, claims Abrams, because his Amended Complaint stated in its conclusion section that "Defendants conspired with hospitals and SNFs to defraud the federal government in pursuing the fraudulent conduct set forth above and aided and abetted each other in furtherance of the conspiracy." (Filing No. 105 at 73.) Fair enough, argue the Defendants in reply, but that "single, conclusory allegation, is not a particularized factual allegation as required by Rule 9." (Filing No. 129 at 9.)

The Court agrees with the Defendants. Abrams' voluminous Amended Complaint focuses solely on facts detailing *internal* fraudulent conduct, barring an FCA conspiracy charge under the intracorporate conspiracy doctrine. *See Travis*, 921 F.2d at 110. To be sure, the Amended Complaint specifically names many hospitals and SNFs that benefited from the schemes. (*See* Filing No. 105 at 42–58.) But no particularity—as demanded by Rule 9 for FCA claims discussing the "who, what, when, where, and how," *Benson*, 944 F.3d at 646—fleshes out any role played by these external actors in the scheme. Indeed, Abrams dropped from his initial Complaint many of these hospitals and SNFs as defendants in his Amended Complaint (*compare* Filing No. 1 with Filing No. 105). As the Defendants correctly note, the broad paragraph in Abrams' Amended Complaint "is simply insufficient to put the Defendants on notice of the nature of the conspiracy,

who the non-defendant co-conspirators are, and what acts those purported co-conspirators took to advance to conspiracy."  (Filing No. 129 at 9.)

Because the intracorporate conspiracy doctrine bars Abrams' charges of FCA conspiracy under 31 U.S.C. § 3729(a)(1)(C), the Court **grants** dismissal as to that claim.

## IV.     <u>CONCLUSION</u>

The Court **GRANTS in part and DENIES in part** the Defendants' Motion to Dismiss (Filing No. 122).  First, because defendants Craig Mackin, Jay Mackin, Jeffrey Mackin, Milby, Sweeney, and Thompson have since been dismissed from the case without prejudice, (Filing No. 143), the Court **denies as moot** the portion of the Motion as it relates to them. Turning to the contentions of the remaining Defendants—that is, Procarent, Yellow Enterprise, CARE, Gateway, and Michael Mackin—the Court **denies** the Motion as it pertains to Counts 1, 2 and 3 of Abrams' Amended Complaint and **grants** the Motion as it relates to Count 4. Finally, the Court **DENIES** Coffelt's Motion to Dismiss as moot, (Filing No. 124), because he has already been dismissed from the case without prejudice.

**SO ORDERED.**

Date:  11/4/2020

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Shelese M. Woods
UNITED STATES ATTORNEY'S OFFICE
shelese.woods@usdoj.gov

Eric Parker Babbs
INDIANA ATTORNEY GENERAL - MEDICAID FRAUD CONTROL UNIT
eric.babbs@atg.in.gov

C. Dean Furman, Jr.
FURMAN & NILSEN PLLC
dean@lawdean.com

Christopher P. Kenney
RICHARD A. HARPOOTLIAN, PA
cpk@harpootlianlaw.com

D. Sean Nilsen
FURMAN & NILSEN PLLC
snilsen@lawsean.com

Joseph P. Griffith, Jr.
JOE GRIFFITH LAW FIRM, LLC
joegriffithjr@hotmail.com

Phillip D. Barber
RICHARD A. HAPOOTLIAN, PA
pdb@harpootlianlaw.com

Richard A. Harpootlian
RICHARD A. HARPOOTLIAN, PA
rah@harpootlianlaw.com

William H. Brammell, Jr.
DRESSMAN BENEZINGER LAVELLE psc
bbrammell@dbllaw.com

Dennis P. Kennedy
DRESSMAN BENZINGER LAVELLE PSC
dkennedy@dbllaw.com

Jeffrey Kent Wicker
DRESSMAN BENZINGER LAVELL PSC
kwicker@dbllaw.com